Gaston, J.
 

 The testator has directed that, upon the death of his wife,' his executors shall sell the bank stock into which he had in a former part of the will directed a portion of his estate to be converted, and “pay over and deliver the money arising from the sale for the benefit of the Methodist Episcopal Church,- in America, tvhereof Francis Asbury is afipresent” (was at the date of the will) :! the presiding bishop, this sum to be disposed of by the conference or the different members composing the same, as they shall, in their godly wisdom, judge will be most expedient or beneficial for the increase and prosperity of the gospel.’” If this bequest of the proceeds of the stock is to be considered made to the body therein described, for their own benefit, as the former part of the clause would seem to declare, it is not to be questioned but that the bequest must fail for want of capacity in the legatees to take and enjoy what is so given. The Methodist Episcopal Church, in America, comprise a great multitude of individuals, of whom some are hourly passing out of existence and others coming into being, and, as an aggregate body, is incompetent to hold.property of any kind, unless, by virtue of some charter or act of incorporation, it be invested with that privilege as an artificial person. But it is manifest from the subsequent part of the clause that the bequest was made to this body ás a
 
 *258
 
 mere instrument for carrying into effect an ulterior and ^o^er purpose of the testator — that the money, the subject of this bequest, might be disposed of by the governing minister of the church, to such objects, and in such manner, as they should determine to be most conducive to the diffusion of the doctrines and precepts and influence of the holy gospel. It is therefore a bequest upon trust; and if the trust be one, over which the constituted authorities of the country can exercise jurisdiction, they will not permit it to be defeated because of incapacity in the designated trustees to take the property, but will fasten the trust upon the property and make or imply trustees, or take other effectual means to cause it to be executed. But if the trust be one over which they cannot assume jurisdiction, then it necessarily fails; for in the legal sense of the term,
 
 that
 
 can never be a trust which leaves any where an uncontrolable power of disposition. Such a power constitutes ownership.
 

 [ It cannot be objected, that the
 
 end
 
 sought to be accomplished by the testator is against law. In every country where justice, peace and good will among men are held in esteem, religion must always command the highest veneration. Abstractedly from its intrinsic excellence, it must be known and acknowledged as the surest basis, on which to ■ rest the superstructure of social order. It cannot be, indeed, - that every religious creed of every mode of worship should •be equally acceptable to God, or in its practical results equally beneficial to man. In many countries the law makers •have undertaken to declare what is the true faith, and topre-scribe which is the rightful worship, and either prohibit all others as unlawful, or tolerate them merely out of indulgence to human frailty. Where religion is thus established by law, of course the courts cannot there recognise an appropriation of funds or property to the support of a prohibited religion, as entitled to the protection of the law, nor will they even uphold such appropriation in aid of a tolerated religion, further .than will accord with the limited indulgence which the law has granted to it. But with us, it is incorporated into the very elements of our social organization .“that all men have a natural and unalienable right
 
 to
 
 wor
 
 *259
 
 ship Almighty God according to the dictates of their own consciences,” and “ that there shall be no establishment of any one religious church or denomination in this State over any other” — but “ that all persons shall be at liberty to exercise their own mode of worship.” It does not hence follow that religion is less the .object of public veneration and regard with us, than in those countries where a church is established by Jaw, but that the State disclaims the right of pronouncing what church is orthodox, and extends its protection equally to every religious church and every religious denomination. Our constitution does not treat the worship of God as indifferent “either in reference'-to the welfare of individuals, orto the common welfare; but assumes it to be a moral duty incumbent upon all men, and their highest privilege as intelligent and accountable beings — a duty that is best performed, both as respects honor to God, the comfort of each man, and the peace and order of society, when that privilege is subject to no legal restraint.”
 
 (State
 
 v
 
 Jasper,
 
 4 Dev. 343) — and a privilege, which is most efficaciously secured and protected, when it is thus solemnly recognized, as the unalienable right of every individual."
 

 The
 
 end
 
 or
 
 object
 
 of this bequest is not only not unlawful, therefore, but it is one entitled to the' highest favor, which, according to our system of jurisprudence, can be extended to a bequest for'any public purpose, however-beneficial. It is clearly within that class of cases, which are termed gifts of charity. But while there is ño difficulty in declaring that the object of the testator is a public, useful and beneficial object, and, therefore, the bequest a charity within the
 
 legal
 
 meaning of that term, yet it is apparent that the precise purpose of the testator in the bequest cannot be collected therefrom. The disposition of the money is directed to be made by the conference “ as they shall, in their godly wisdom, judge will be most expedient or beneficial for the increase and prosperity of the gospel.” The destination ■of the money is to the advancement of the gospel. But the means by which that end is to be effected, are left entirely
 
 to the
 
 uncontrolled discretion of the conference. Is the money to be employed in building churches, in establishing
 
 *260
 
 schools, in paying ministers, in publishing books, or in supPorting the poor? These, and many such as these, would appear to be means tending to promote the spread and increase oí the gospel; and any of these, had they been definitely expressed, might be regarded as specific charitable objects, which the courts could cause to be executed, although the trustees designated by the testator were unable to perform them. But here is property given upon a trust, charitable indeed, bnt oí an indefinite character, and the trustees named by the testator are incompetent to take or hold the property so given; and the question presents itself distinctly, on which, though we have recently had occasion to allude to it, we have refrained hitherto from making up, much, more from expressing an opinion, (see
 
 State
 
 v
 
 McGowen,
 
 2d Ired. Eq. Rep. 9; and
 
 State
 
 v
 
 Gerard,
 
 decided at'tbis term;) what is the disposition which by our law must be made of property so given?
 

 It is certainly the general rule, that, where property is given upon a clear trust but for uncertain objects, the subject of such trust is regarded as undisposed of, and the benefit of the trust results to those, to whom the law gives the property in default of disposition by its owner. In the case of a trust, there must be somebody in whose favor the court can decree a performance. IÍ those, for whom a trust is created, are not sufficiently indicated, or may not be permitted to have the benefit thereof, the trust is ineffectually disposed of by the owner, and the law disposes of it for him.
 
 Morrice v Bishop of London,
 
 9 Ves. 405. But this doctrine does not obtain, in England, with regard to gifts for charity It is there n.ow settled, upon authorities which it is deemed too late to controvert, that where a charitable purpose is expressed, however general, the bequest shall not fail on account of the indefiniteness of the object, but the particular mode of its application will be directed by the King in some cases, and in others, by the Chancellor. The cases have there gone this length, that if a testtator hrs manifested a general intention to give to
 
 charity,
 
 it matters not how uncertain the objects may be, or whether the purposes directed be lawful or not, or whether the bequest can be car
 
 *261
 
 ried into execution or not according to the testator’s wishes — in all these and in the like cases, the courts' will sustain the legacy as a legacy to charity, and execute it as they call it
 
 cy
 
 pres, that is, according to their notions of charity — or, upon a direction from the Crown under the sign manual, as to the charitable purpose to which it shall be applied. And these cases are understood to proceed upon the principle, that where a testator has manifested an intent that his property shall be applied to a charitable purpose, charity,
 
 at all
 
 events, is the purpose of his will, and the courts will find out for him some charitable purpose, if he has not sufficiently declared his, or substitute a charitable disposition of their own, in lieu of that which he has declared, but'which the law will not execute. The principle is admitted to be unsound, and several of the decisions founded upon -it are revolting to common sense. But, wise or unwise — reasonable or absurd — the law is there so settled, and the judicial tribunals of that country are bound so to administer it, however repugnant it may be to their own sense of right.
 

 But we have no instance in this state, or as far as we are able to learn in any of the States of the Union, where this extravagant doctrine on the subject of charities has ever been acknowledged, and surely the courts of this country ought to pause Jong before they adopt it. By affecting to consider charity as the substance, and all else as but the formal part of a will, and compelling the testator to be charitable in our way, when we do not know in what way he purposed to be charitable, or when the charity.he purposed cannot be executed, we shall, in effect, be making a will for him where he is silent, and altering it when his declared intention necessarily fails. Especially odious and dangerous would be the exercise of such a power, in the case of the disposition of property to religious uses imperfectly defined. Where there is but one religion known to the law — and a religious hierarchy established by the law — there may be some consistency of plan in the declaration of more defined uses in cases of this description. But where all religious denominations are equal before the law, what guide is the Judge to have when called on to make such a declaration?
 
 *262
 
 js he to act according to his own faith or upon his own opin-*ons ^igious truth, or according to what he believes to have been the opinions or views of the testator? If accord-jng to the is it not almost certain that his declaration of the trust will make it a very different trust from what the testator intended? and if according to the latter, what certainty can he have that he knows, understands and follows them out? In the case before us, the testator willed that the proceeds of this pi-operty should be applied to the increase and prosperity of the gospel, as the conference of the Methodist Episcopal Church, in America, should, in their godly wisdom, judge expedient for that purpose. In that wisdom he confided, and he did not purpose that the property should be disposed of otherwise than that wisdom might direct. To direct any other disposition would be to substitute our will for his.
 

 But not only have the courts in this country as yet forborne from adopting this settled, but at the same time confessedly wrong, principle of the English law on the subject of charities, but this court has, on'one occasion, directly repudiated it. In the case of
 
 McAuley
 
 v Wilson, 1 Dev. Eq. Rep. 276, Judge Henderson remarks “If there be any one who can compel the execution of the trust, that is, the application of the trust fund according to the directions of the devisor, then it is a valid trust, at least so much of it as is necessary to answer the intent of the founder, if there be more than is necessary for that purpose, the excess results to the heir at law or next of kin. For we do not, as they do in England, apply it to other objects of a similar kind by what is called the doctrine of
 
 cy pres.”
 

 It is the opinion of this court that the bequest in question, being made for a multitude of persons in their aggregate capacity, as a religions denomination in America, which persons have not been incorporated by any act or charter of incorporation, and to be disposed of as the ministers of that denomination shall deem most expedient for the increase and prosperity of the gospel, the same cannot be carried into execution, and is therefore void. The consequence necessarily is, that the deceased, in regard to the subject matter of this
 
 *263
 
 bequest, must be declared to have died intestate, and the plaintiffs, who are admitted to be and to represent his of kin, aré entitled to have an account thereof from the defendant.
 

 Per CuRiam. Decreed accordingly.