WACHOVIA BANK AND TRUST COMPANY, N. A., JOHN C. WHIT-AKER and L. D. LONG, Trustees Under the Will of Mrs. Kate G. Bitting Reynolds, Deceased, Petitioners, v. ROBERT MORGAN, Attorney General of The State of North Carolina; ST. JOSEPH'S HOSPITAL, INC.; CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY (Formerly Charlotte Memorial Hospital); CITY OF WINSTON-SALEM; NORTH CAROLINA BAPTIST HOSPITALS, INC.; REX HOSPITAL; DUKE UNIVERSITY; WESLEY LONG HOSPITAL, INC.; HICKORY MEMORIAL HOSPITAL, INC.; HUGH CHATHAM MEMORIAL HOSPITAL, INC.; PASQUOTANK COUNTY; GOOD SAMARITAN HOSPITAL, INC.; SOUTHEASTERN GENERAL HOSPITAL (Formerly Baker-Thompson Memorial Hospital, Inc.); TRUSTEES OF LINCOLN HOSPITAL; ROCKY MOUNT SANITARIUM, INC.; S. D. McPHERSON, Trading as McPherson Hospital; LEXINGTON MEMORIAL HOSPITAL, INC.; J. C. CASSTEVENS, Trading as Casstevens Clinic; THE ASHEVILLE ORTHOPEDIC HOME, INC.; PROVIDENCE HOSPITAL (Formerly Petrie Hospital, Inc.); ANSON COUNTY HOSPITAL (Formerly The Anson Sanatorium); FORSYTH COUNTY; CITY OF RALEIGH; WAKE COUNTY; CUMBERLAND COUNTY; PRESBYTERIAN HOSPITAL, INC.; WATTS HOSPITAL; SAMPSON COUNTY MEMORIAL HOSPITAL, INCORPORATED; ONSLOW MEMORIAL HOSPITAL, INCORPORATED; NEW HANOVER MEMORIAL HOSPITAL, INC.; HENDERSON COUNTY (Operator of Margaret R. Pardee Memorial Hospital); WILSON MEMORIAL HOSPITAL, INC.; MEMORIAL MISSION HOSPITAL OF WESTERN NORTH CAROLINA, INCORPORATED; C. J. HARRIS COMMUNITY HOSPITAL, INCORPORATED OF SYLVA, NORTH CAROLINA; MOREHEAD MEMORIAL HOSPITAL; NORTH CAROLINA HOSPITAL ASSOCIATION; Respondents

No. 7021SC518

(Filed 21 October 1970)

1. **Appeal and Error §§ 1, 7; Trusts § 4— appeal by trustees of charitable trust — parties aggrieved — consideration of appeal**

    Although an appeal by the trustees of a charitable trust was subject to dismissal on the ground that there were no parties aggrieved by the order of the superior court modifying the trust, the Court of Appeals nonetheless considers the appeal in the exercise of its supervisory power, where the order affected the interests of a substantial number of public and private hospitals in the State, as well as thousands of persons who will be hospitalized as charity patients. G.S. 1-271, G.S. 7A-32(c).

2. **Appeal and Error § 7— right of appeal — judgment entered on party's own motion**

    A party has no right to appeal from a judgment entered on his own motion.

Trust Co. v. Morgan, Attorney General

3. **Trusts § 4— petition to modify charitable trust — jurisdiction of superior court**

Superior court properly had jurisdiction over the parties and subject matter in a hearing on a trustees' petition to modify a charitable trust that was subject to a 1948 judgment setting forth the rights and duties of the trustees, where (1) the 1948 judgment specifically provided for the retention of the case on the inactive docket for reactivation upon proper notice and (2) the trustees' petition and proper notice were served on all parties.

4. **Trusts § 4— charitable trust — trial court's authority to modify trust terms**

Where a trial court correctly finds that it is now impossible or impracticable to administer a charitable trust in the manner directed by the settlor's will, the trial court has plenary authority, both inherent and statutory, to order that the trust be administered as nearly as possible thereto so as to fulfill the general charitable intention of the settlor. G.S. 36-23.2.

5. **Trusts § 4— petition to modify charitable trust — sufficiency of findings of fact**

In a trustee's action to modify a charitable trust instrument which provided for the direct payment of trust income to the hospitals of the State for the benefit of charity patients, the trustees contending that the innovations of governmental and social programs have made it impossible or impracticable to accomplish the purpose of the trust, there was insufficient evidence to support the trial court's findings of fact that needy patients are being so adequately cared for by governmental and social programs that direct payment by the trust toward the care of the patients is impossible or impracticable; consequently, the judgment of the trial court granting relief to the trustees is reversed without prejudice to the trustees to reapply for relief on a theory more consistent with the facts shown by the evidence.

Judge MORRIS concurring.

Judge BROCK dissenting.

APPEAL by petitioners from *Lupton, J.,* 27 April 1970 Session of FORSYTH County Superior Court.

Action was initiated in November 1947 by trustees named under the will of Mrs. Kate G. Bitting Reynolds, deceased, for instructions and advice concerning their rights and duties under Section Five of the will. Judgment was entered 24 May 1948 granting the instructions and advice sought and ordering that the case be retained on the inactive docket of the court for further orders, with leave granted to the trustees and other interested parties to reactivate the case upon notice to proper parties. The judgment was reviewed and affirmed by the Supreme Court. *Trust Co. v. McMullan, Attorney General,* 229 N.C. 746, 51 S.E. 2d 473.

On 18 August 1969, the present trustees under Mrs. Reynolds' will filed a petition in the original action requesting broader discretionary powers in administering the trust. In the petition the trustees alleged that because of the innovations of governmental and social programs it has become impossible or impracticable to accomplish the testatrix's purpose of providing medical care to charity hospital patients in North Carolina by paying the income of the trust in the manner set forth in Section Five of the will. The pertinent provisions of Section Five are as follows:

"All the Rest, Residue and Remainder of my estate . . . I give, devise and bequeath:

To my trustees hereinafter named, in trust, . . . to pay three-fourths of the net income therefrom to the Hospitals located in the State of North Carolina, for the benefit of Charity patients, and said trustees shall pay such income quarterly to said hospitals upon the basis of the average number of charity patients cared for therein during each day of the immediately preceding period of three months. Any hospital participating under the provisions of this Will except those benefiting from specific bequests shall make a monthly report to my trustees showing the number of charity patients cared for during each day of the month, and my trustees shall be the sole judge as to the eligibility to receive benefits hereunder of any and all hospitals, and the decision of my trustees in respect thereto shall be final."

After a hearing on the petition the presiding judge signed the judgment tendered by the trustees, wherein findings of fact are set forth including the following:

"The Testatrix, by SECTION FIVE of her Will, manifested a general intention to devote her property, the residual portion of her estate, to charity.

(11) It was the manifested general intention of Mrs. Kate G. Bitting Reynolds, Deceased, the settlor or testatrix, to devote a three-fourths portion of her residuary estate toward the promotion of health and medical care for the people of North Carolina in need of medical care and assistance.

(12) Mrs. Kate G. Bitting Reynolds executed her Will on or about July 26, 1934, and died a resident of Forsyth County on September 23, 1946. Since the execution of her

Will, and since the date of her death, there have been significant changes in the cost of hospital care and in the assumption of public responsibility for the care of charity patients.

(13)    Since the execution of the Will of Mrs. Kate G. Bitting Reynolds in 1934, and since her death on September 23, 1946, the financial needs which the Testatrix intended to directly subsidize have been reduced or eliminated by the initiation or augmentation of the following trends and public programs: [then follows a list of programs and trends including the federal "Medicare" and "Medicaid" program, federal grants for maternal and child welfare programs, veterans health programs, various State, county and local assistance programs, the trend toward private medical insurance protection and others].

(14)    Providing health care and meeting medical needs is a fast-developing field requiring at times the use of new, innovative and experimental approaches.

(15)    The Trust, devise or bequest for charity created by Mrs. Kate G. Bitting Reynolds, Deceased, for the people of North Carolina in need of medical care and assistance, has become impossible or impracticable of fulfillment; the settlor, or testatrix, has not provided, either directly or indirectly, for an alternative plan in the event of such impossibility or impracticability; and the Court, upon the application of the Trustees of the Trust, should order an administration of the trust as nearly as possible to fulfill the manifested general charitable intention of the settlor or Testatrix.

(16)    As of the 4th day of May, 1970, the estimated net annual income of the Hospital Trust created under SECTION FIVE of the Will of Mrs. Kate G. Bitting Reynolds, Deceased, is approximately $941,000; the principal of said Trust is approximately $18,021,000; and the Trustees are holding an additional $2,408,000 in accumulated, but undistributed, income.

* * *

(18)    The Trustees, in the application of Trust income, should be authorized to establish an Advisory Board of such individuals as the Trustees may from time to time deem best suited to enable them to apply Trust income for the manifested general charitable intention of the testatrix

and to employ such professional or administrative assistance as, in the opinion of the said Trustees, is necessary or desirable for the efficient and expeditious administration and disposition of trust funds. The Trustees should be expressly authorized to expend trust funds for the purpose of making intelligent application of Trust income and, in so doing, to provide reasonable compensation to members of the Advisory Board, to purchase qualified advice and research data and to establish an office with pertinent supplies, equipment and staff."

The judgment, based upon the findings set forth above, concluded that the testatrix expressed a general testamentary intent which has become impossible or impracticable of fulfillment in the manner prescribed in the will. Thereupon, pursuant to the authority granted in G.S. 36-23.2 and its equitable jurisdiction, the court adjudged and decreed, in pertinent part, as follows:

"(1)    That the Trustees under SECTION FIVE of the Will of Mrs. Kate G. Bitting Reynolds, Deceased, by reason of the changed circumstances and conditions referred to in the FINDINGS OF FACT AND CONCLUSIONS OF LAW, are no longer required to make payments of income from the Hospital Trust to Hospitals located in North Carolina for the benefit of Charity Patients but the Trustees may and they are hereby authorized to use the income from the Hospital Trust, including accumulated income, in such manner as the Trustees, in their uncontrolled discretion, subject only to further orders of the Court, may from time to time deem best to serve, directly or indirectly, the health and medical needs of the people of North Carolina who may be in need of medical care or assistance.

In giving this broad authority to the Trustees, the Court recognizes that providing for the health and meeting the medical needs of people in North Carolina who may be in need of medical care or assistance is a fast-developing field. It is the purpose of the Court to authorize the Trustees, acting upon informed advice and counsel, to be progressive and innovative in meeting such needs and providing such care and from time to time to adopt new and untried methods in this field, and to modify, abandon and change such methods in such manner and at such times as the Trustees, in the exercise of their discretion, may deem appropriate and

proper. The Court also recognizes that it may be impossible to provide such care and assistance solely for needy persons; and the Trustees are authorized to provide such care or assistance whenever in their judgment a substantial benefit will be derived by needy persons, even though benefit is also derived by others.

(2)   The Trustees are hereby authorized to establish an Advisory Board of such persons as the Trustees may from time to time deem best suited to advise and counsel them in the application of trust income toward the promotion of health and medical care for the people of North Carolina in need of medical care or assistance.

(3)   In the administration of the Hospital Trust (the three-fourths portion of the residuary estate of Mrs. Kate G. Bitting Reynolds, Deceased), the Trustees should be, and they are hereby, authorized and empowered, in the exercise of their discretion, to set up reserves out of the income of the Trust and to increase, decrease, exhaust and replenish such reserves from time to time as conditions affecting the Trust and the beneficiaries thereof may, in the judgment of the Trustees, require; and the Trustees are further authorized and empowered to expend Trust funds for the purpose of making intelligent application of trust income and, in so doing, to provide reasonable compensation to members of any Advisory Board, to purchase such further qualified advice and research data as the Trustees from time to time deem necessary, and, to the extent that the Trustees may from time to time deem necessary or proper, to establish an office with pertinent supplies, equipment and staff to carry out the administration of the trust as herein authorized.

*   *   *

(5)   This cause shall continue to be retained upon the inactive docket of this Court for further orders, with leave granted to the Trustees, or the surviving Trustees or Trustee, or any other party hereto or any other hospital or related institution or association or other similar body representing hospitals or related institutions or associations, upon ten days' written notice to the Attorney General of North Carolina and to such of the other parties named in the now caption of this JUDGMENT as may be living or in existence, or their respective counsel of record, to apply to

Trust Co. v. Morgan, Attorney General

this Court for further orders in the premises, supplementing and further implementing this JUDGMENT."

At the suggestion of the trial court the petitioners appealed assigning "possible errors."

*Womble, Carlyle, Sandridge & Rice by W. P. Sandridge, Jr., for plaintiff appellants.*

*Robert Morgan, Attorney General, by Christine Y. Denson, Staff Attorney, for respondent appellee State of North Carolina.*

*Hollowell and Ragsdale by Edward E. Hollowell for respondent appellee North Carolina Hospital Association.*

GRAHAM, Judge.

It does not appear that any party has objected to the entry of the judgment tendered to the court by the trustees. The Attorney General and the North Carolina Hospital Association have filed briefs in which they join the trustees in urging that the judgment be affirmed. No briefs have been filed by any party urging the contrary.

[1, 2] A question arises as to whether the trustees may appeal as aggrieved parties within the meaning of G.S. 1-271. A party has no right to appeal from a judgment entered on his own motion. *Dillon v. Wentz,* 227 N.C. 117, 41 S.E. 2d 202; *Johnson v. Sidbury,* 226 N.C. 345, 38 S.E. 2d 82. The trustees admit in their brief that there are no aggrieved parties. The judgment appealed from was entered on the motion of the appellant trustees. Hence, this appeal is subject to being dismissed *ex mero motu* as presenting no controversy. However, this case affects the interests of substantial numbers of public and private hospitals in this State, as well as thousands of persons who are now, or in the future will be, hospitalized in North Carolina as charity patients. We have, therefore, elected to entertain the appeal in the exercise of the supervisory power vested in this Court under the provisions of G.S. 7A-32(c). We also point out that the same situation existed when the first judgment entered in this cause was appealed, and the Supreme Court entertained the appeal. *Trust Co. v. McMullan, Attorney General, supra.* (See also: *Cotton Mills v. Local 578,* 251 N.C. 218, 111 S.E. 2d 457; *State v. Scoggin,* 236 N.C. 1, 72 S.E. 2d 97; *Trust Co. v. Waddell,* 234 N.C. 454, 67 S.E. 2d 651.)

[3]  The first questions raised by the trustees' assignments of possible errors are jurisdictional. We conclude, under the authority of the Supreme Court opinion affirming the first judgment entered in this action *(Trust Co. v. McMullan, Attorney General, supra)*, that the trial court had jurisdiction over the parties and the subject matter and did not err in permitting this action to be reopened. Although some of the parties named in the original suit are no longer in existence, appropriate parties have been substituted. The judgment of 24 May 1948 specifically provided for the retention of the case on the inactive docket for reactivation upon proper notice. It appears that the petition and proper notice were served on all parties and that they are properly before the court.

The trustees seek a determination as to whether the court had the authority to grant the broad discretionary powers to administer the trust which are enumerated in the judgment. We look first to the authority granted by statute. G.S. 36-23.2, enacted in 1967, provides as follows:

"Charitable Trusts Administration Act.— (a) If a trust for charity is or becomes illegal, or impossible or impracticable of fulfillment or if a device [sic] or bequest for charity, at the time it was intended to become effective is illegal, or impossible or impracticable of fulfillment, and if the settlor, or testator, manifested a general intention to devote the property to charity, any judge of the superior court may, on application of any trustee, executor, administrator or any interested party, or the Attorney General, order an administration of the trust, devise or bequest as nearly as possible to fulfill the manifested general charitable intention of the settlor or testator. In every such proceeding, the Attorney General, as representative of the public interest, shall be notified and given an opportunity to be heard. This section shall not be applicable if the settlor or testator has provided, either directly or indirectly, for an alternative plan in the event the charitable trust, devise or bequest is or becomes illegal, impossible or impracticable of fulfillment. However, if the alternative plan is also a charitable trust or devise or bequest for charity and such trust, devise or bequest for charity fails, the intention shown in the original plan shall prevail in the application of this section.

(b)   The words 'charity' and 'charitable,' as used in this section shall include, but shall not be limited to, any elee-

mosynary, religious, benevolent, education, scientific, or literary purpose."

This statute represents an obvious intent on the part of the legislature to invest the superior courts of this State with the power of *cy pres*. *Cy pres*. meaning "as near as possible," is the doctrine that equity will, when a charity is originally or later becomes impossible, inexpedient, or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. Bogert, Trusts and Trustees 2d, § 431. Before the passage of this statute, our Supreme Court often held that the doctrine of *cy pres* did not obtain in this State. *Board of Education v. Wilson,* 215 N.C. 216, 1 S.E. 2d 544; *Woodcock v. Trust Co.,* 214 N.C. 224, 199 S.E. 20; *Thomas v. Clay,* 187 N.C. 778, 122 S.E. 852; *Trust Co. v. Ogburn,* 181 N.C. 324, 107 S.E. 238; *Keith v. Scales,* 124 N.C. 497, 32 S.E. 809; *Holland v. Peck,* 37 N.C. (2 Ire. Eq.) 255. However, it has nevertheless been repeatedly recognized in this jurisdiction that the failure of the method designed by the trust for carrying out a general charitable purpose does not destroy the trust. In *Johnson v. Wagner,* 219 N.C. 235, 13 S.E. 2d 419, Devin, J. (later C.J.), speaking for the court stated:

> "In this case, while the general purpose of the testator to donate property to charitable uses, and the designation of the ultimate beneficiaries for whom the trust is created, sufficiently appear, the fact seems to have been definitely established that the particular mode for the use of the designated property has failed. The gift of the property for a designated use in a particular manner has been declined as impracticable. The donation of the land for use as an assembly ground has failed, but that does not destroy the trust. It seems to be a generally recognized principle controlling the decisions of courts of chancery on the subject that when a definite charity has been created, the failure of the particular mode in which it is to be effectuated does not destroy the trust. It has been well said, 'the substantial intention shall not depend on the insufficiency of the formal intention.' *Trust Co. v. Ogburn, supra.* The general intent of the testator must prevail over the particular mode prescribed. Zollman Am. Law of Charities, sec. 137. Notwithstanding the impossibility of effectuating the particular method prescribed for carrying out the provisions of a trust, the Court will exercise its equitable jurisdiction and super-

vise the administration of the fund so as to accomplish the purposes expressed in the will. *Paine v. Forney, supra; Trust Co. v. Ogburn, supra.*"

Other cases generally applying the same principle enunciated above include: *Trust Co. v. Construction Co.*, 275 N.C. 399, 168 S.E. 2d 358; *Brooks v. Duckworth*, 234 N.C. 549, 67 S.E. 2d 752; *Hospital v. Comrs. of Durham*, 231 N.C. 604, 58 S.E. 2d 696; *Cutter v. Trust Co.*, 213 N.C. 686, 197 S.E. 542; *Trust Co. v. Ogburn*, 181 N.C. 324, 107 S.E. 238.

In 4 Scott, The Law of Trusts 3d, § 399.4 the following salient point is made: "The result of a too strict adherence to the words of the testator often means the defeat rather than the accomplishment of his ultimate purpose. He intends to make the property useful to mankind, and to render it useless is to defeat his intention. 'Under the guise of fulfilling a bequest,' said John Stewart Mill, 'this is making a dead man's intentions for a single day a rule for subsequent centuries, when we know not whether he himself would have made it a rule even for the morrow. . . . No reasonable man, who gave his money, when living, for the benefit of the community, would have desired that his mode of benefiting the community should be adhered to when a better could be found.' " (Quoting from 1 Mill, Dissertations 32, 36.)

[4] If the trial court correctly concluded that it is now impossible or impracticable to administer the trust in the manner directed by Mrs. Reynolds' will, it had plenary authority, pursuant to its inherent equitable power and under the provisions of G.S. 36-23.2, to order that it be administered as nearly as possible thereto so as to fulfill the general charitable intention of Mrs. Reynolds. Her general intent was obviously to benefit those persons in North Carolina in need of medical care and financially unable to obtain it.

We are also of the opinion that the judgment is not defective because it authorizes the trustees, in their "uncontrolled discretion" to apply the proceeds in accordance with Mrs. Reynolds' general intent, rather than undertaking to outline and direct the trustees to employ a particular substitute mode of administration. "Uncontrolled discretion," as used in the judgment, simply means that the trustees have the authority to select from among numerous modes of administration that are undoubtedly available to carry out Mrs. Reynolds' general intent. It does not mean that their discretion in the use of the trust funds is un-

bridled to the extent that they can employ the funds for purposes inconsistent with the purpose of the trust.

[5] The judgment, however, must nevertheless be reversed because the evidence presented fails to establish that the mode directed by Mrs. Reynolds for administering the trust has become either impossible or impracticable *for the reasons asserted in the petition, or because of the facts found by the court.* The trustees base their claim, as argued in the brief, upon the proposition that "since the date the will was executed and since Mrs. Reynolds' death, there has been an awakening of awareness of the medical needs of society. This awareness has resulted in the creation of numerous governmental and public programs which have practically done away with the charity patient which Mrs. Reynolds sought to benefit." This is also the basis of the court's judgment. In finding of fact number 13, and a corresponding conclusion of law, the court determined that the financial needs which Mrs. Reynolds intended to subsidize directly have been reduced or eliminated by the initiation or augmentation of certain governmental trends and programs to the point where it has become impracticable or impossible to fulfill the purpose of the trust. There is evidence, to be sure, that the programs enumerated in the court's order are now providing hospital care for numerous persons who otherwise would be classified as charity patients. This evidence, however, falls far short of showing that the charity patient, as known by Mrs. Reynolds, has virtually disappeared from the scene in North Carolina. For instance, the trustees' evidence shows that after the advent of Medicare the number of charity days of hospital care provided for patients in North Carolina decreased substantially. But 50,615 days of charity care were nevertheless still provided by 106 North Carolina hospitals in the quarter ending 30 June 1967. There is no evidence to show how much, if any, decrease has occurred since that date. Nor is there any showing as to how the number of charity patients being provided for in North Carolina hospitals today compares with the number provided for at the time Mrs. Reynolds died or at the time she executed her will. Insofar as the record shows, we are left to wonder if, in spite of all the governmental programs, charity care has not in fact increased. We take notice of the substantial increase in population and the modern trend to hospitalize the ill. Could it be that these factors, and perhaps other factors, have offset any decrease resulting from the various assistance programs?

It is significant to note that several hospitals filed answers denying that there had been a decrease in charity patients since the advent of Medicare. Duke University Hospital alleged that the days of charity care provided there increased during the year of 30 June 1966 to 30 June 1967, which is the year alleged in the petition as representing a significant decrease on account of Medicare.

We view this case as similar in many respects to the case of *West v. Lee*, 224 N.C. 79, 29 S.E. 2d 31 (1944). There, plaintiffs sought to have terminated a trust established by a will of 1895. The purpose of the trust was to provide a free permanent common school English education for poor white children of Buncombe County of eight years and over. Plaintiffs attacked the trust on the theory that the expansion of the state school system and the enlargement of opportunity adequately met every educational demand of indigent children and destroyed the object of the trust. In rejecting plaintiffs' efforts, Justice Seawell stated:

> "We agree with the encomium counsel for the appellants have addressed to public school progress. Even some of the smaller towns have a larger investment in educational facilities, and buildings more commodious and impressive than the University of North Carolina afforded when Aycock, McIver and Alderman matriculated there. The public school term has been increased under the Constitution from four to six months, and by statute to a minimum of eight months, and a maximum of nine months, if the district or the county may so request. Appropriations are large, considering per capita wealth, and the opportunities of free tuition afforded the youth of the State have been vastly enlarged. But it is not claimed by the most optimistic that this amazing progress has saturated the public demand or the public need. Teacher load is a serious problem, menacing efficiency of instruction. Individual attention to backward children is a related unsolved problem. If the Murray trust were instigated today, we could not, as a matter of law, deny it a place in the all-out educational effort upon the argument advanced, if we were permitted to entertain it at all.
>
> \* \* \*
>
> Indeed, there is implied in the definition of charitable trusts, whose purposes almost necessarily are found amongst those

which all enlightened countries recognize as also obligations of government, that they may, as coadjutors, stand side by side with State agencies instituted and maintained for the same purpose.

'A charity may be defined as a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.' Scott on Trusts, Sec. 368; *Whitsett v. Clapp*, 200 N.C., 647, 649, 158 S.E., 183.

The appellants have admitted that even in prosperous Asheville and Buncombe County, as indeed elsewhere in all the world, the Biblical adage holds true: 'Ye have the poor always with you'; and that there are, in the area covered by the trust, those who may qualify as beneficiaries. The plaintiffs, we think, are concluded by this admission."

There plaintiffs sought dissolution of the trust; whereas, here the trustees are seeking only a deviation in the method directed by the trust for the expenditure of funds. The main purpose being kept in view, considerable flexibility should always be allowed in the details of the execution of a trust, so as to adapt it to changed conditions. *Mars v. Gibert*, 93 S.C. 455, 466, 77 S.E. 131, 135. But the theory upon which the trustees have proceeded here is identical to that put forward by the plaintiffs in *West:* that is, that because of changes in conditions, the objects of the trustor's charity have become extinct, or virtually so. Here, as in *West*, the evidence fails to support such a theory.

Uncontradicted evidence of the trustees here tends to show that the demand for charitable funds (due perhaps to an escalation of hospital costs rather than an increase in the number of charity patients) has actually increased to the point where the money which can be paid by the trust to hospitals in the manner provided by the will is insignificant and of little help in encouraging hospitals to admit and care for charity patients. This is so largely because the average daily cost of hospital care in North Carolina has risen from $3.03 when Mrs. Reynolds executed her will to almost $50.00 today. The slightly more than $3.00 a day which is available from the trust income to apply toward the

daily care of each patient is now of little significance. It has been suggested that the hospital administrative cost of keeping records, reporting to the trustees and applying for proceeds under the trust, in some instances nearly equals the benefits paid. The Senior Vice President of the corporate trustee explained the dilemma of the trustees as follows:

"In short, we were concerned that the money was not accomplishing as much as it might. *In many cases, the payments to hospitals were relatively small and were just swallowed up in the tremendous expense of hospitals.*" (Emphasis added.)

In our opinion the evidence of the trustees is inconsistent with the allegations in the petition and the court's findings that needy patients are being so adequately cared for by governmental and social programs that direct payments by charity toward their care is impossible or impracticable. In fact, according to the uncontradicted evidence, if it is now impracticable to administer the trust in the manner provided by Mrs. Reynolds, it is for the reason that the burden of caring for charity patients in hospitals has become so great that the small amount available to apply toward this cost from the trust is insignificant and can be more effectively used in other ways. It is clearly not, as found by the court, because of governmental and social programs and trends. These programs and trends should in fact reduce the burden of charity, thereby making more effective the direct payments to hospitals as directed by Mrs. Reynolds' will.

We are powerless to make findings of fact. Therefore we may not now concern ourselves with whether the trustees are entitled to the relief sought because the increased cost of charity care has made the payments under the trust impracticable, thereby making it necessary that another mode of administering the trust be employed in order to effectively carry out the general intent of Mrs. Reynolds. The fact is that relief has been granted on totally different and inconsistent findings which are unsupported by the evidence. To affirm the judgment in its present form would be to acknlowledge that governmental and social programs and trends have preempted the need for any direct charitable assistance to hospitals for the care of needy patients. This we are unprepared to do.

We reverse the judgment without prejudice to the trustees to reapply for relief on a theory more consistent with the facts shown by the evidence.

Reversed.

Judge MORRIS concurs in the result.

Judge BROCK dissents.

Judge MORRIS concurring:

I am in accord with the result reached and with the reasons therefor. In addition, however, I feel compelled to state that I have considerable reservations with respect to the propriety and legal correctness of that portion of the judgment authorizing the trustees to "establish an Advisory Board of such persons as the Trustees may from time to time deem best suited to advise and counsel them in the application of trust income toward the promotion of health and medical care for the people of North Carolina in need of medical care or assistance." The broadness of the order allowing the trustees to employ an Advisory Board could result in a complete delegation of duties by the trustees chosen by the testatrix, with the Advisory Board, for all practical purposes, acting as trustees. This, in my opinion, goes far beyond the employment, on a temporary basis, of experts for assistance and advice in a particular area and with respect to a particular question. Indeed, the judgment gives this authority to the trustees in addition to the employment of an Advisory Board.

Judge BROCK dissenting:

I do not disagree with the determination in the majority opinion that the findings of the trial tribunal are inconsistent with the evidence, and for that reason would require reversal of the judgment entered. However, I would point to an additional ground for reversal lest upon rehearing the trial tribunal might be led to believe our silence on the subject constituted approval.

Finding of Fact No. (18) is as follows:

"(18) The Trustees, in the application of Trust income, should be authorized to establish an Advisory Board of such individuals as the Trustees may from time to time deem best suited to enable them to apply Trust income for the manifested general charitable intention of the testatrix and to employ such professional or administrative assistance

as, in the opinion of the said Trustees, is necessary or desirable for the efficient and expeditious administration and disposition of trust funds. The Trustees should be expressly authorized to expend trust funds for the purpose of making intelligent application of Trust income and, in so doing, to provide reasonable compensation to members of the Advisory Board, to purchase qualified advice and research data and to establish an office with pertinent supplies, equipment and staff."

Thereafter section (2) of the judgment provides:

"(2) The Trustees are hereby authorized to establish an Advisory Board of such persons as the Trustees may from time to time deem best suited to advise and counsel them in the application of trust income toward the promotion of health and medical care for the people of North Carolina in need of medical care or assistance."

A portion of section (3) of the judgment provides:

"(3) * * * the Trustees are further authorized and empowered to expend Trust funds for the purpose of making intelligent application of trust income and, in so doing, to provide reasonable compensation to members of any Advisory Board, to purchase such further qualified advice and research data as the Trustees from time to time deem necessary, and, to the extent that the Trustees may from time to time deem necessary or proper, to establish an office with pertinent supplies, equipment and staff to carry out the administration of the trust as herein authorized."

By the portions of the judgment above quoted, the Trustees are authorized to shift responsibility for decision making to an Advisory Board selected by them; and the Trustees are authorized to fix compensation for the members of such a board, to be paid from the Trust funds. Also, the judgment authorizes the Trustees, at the expense of the Trust, to rent office space, purchase supplies and equipment for the office, and employ a staff of personnel to carry out the administration of the Trust. Thus, the Trustees may not only shift the responsibility of decision making to an advisory board, but may also shift the actual administration of the Trust to a staff employed and housed in an office for that purpose; all at the expense of the Trust.

The compensation to the Trustees, as disclosed by petitioners' exhibit #10, is estimated to be $60,110.72 for the year 1970. It seems that the Trust is already paying a considerable sum for time and services to administer the Trust; and upon the record in this case I don't believe it is just or equitable, or within the authority of the Court, to allow the Trustees to be adequately compensated for administering the Trust, and, at the same time, at additional expense to the Trust, employ an advisory board to tell them how to administer and a staff to carry out the administration.

There is no authority granted by the Trust instrument itself which would allow the Trustees to employ an Advisory board, rent office space, purchase office supplies and equipment, or employ a staff to carry out the administration of the Trust. The implication of item 5 of *Section Seven* of the Will is to the contrary; by this section the compensation for administering the trust is clearly set out by Mrs. Reynolds. The judgment as entered, in effect, amends item 5 of *Section Seven* by considerably increasing the compensation to the Trustees; not by increasing the money paid them, but by allowing the Trust to pay someone else to furnish the services for which the Trustees are being paid.

If the Trustees are to continue in office it is only proper that they supply the functions and shoulder the responsibilities for which they are being compensated, and which they accepted when they assumed their office as Trustees.

In my opinion the trial tribunal exceeded its authority in portion of the judgment discussed in this dissenting opinion.